TUCKER v. WYCOUGH.

4-4794

Opinion delivered November 8, 1937.

*Dene H. Coleman, R. W. Tucker, S. M. Casey* and *Shields M. Goodwin,* for appellants.

*John F. Grammer* and *J. J. McCaleb,* for appellee.

SMITH, J. Appellees, Ernest A. Wycough and Mrs. Willie Wycough, who are husband and wife, brought this suit against the administrator and heirs-at-law of James

Swaim, deceased, upon the theory that about six years before his death the deceased had entered into an agreement with them to the effect that they should take care of deceased for the remainder of his life, furnish him with a home, including his meals or such as he cared to eat with them, certain other personal services, including his laundry work, and nursing during sickness, and that in consideration therefor deceased, Swaim, should devise appellees all property he might own at his death.

Swaim died October 29, 1936, and R. W. Tucker was appointed administrator of his estate. In the complaint filed in this cause, it was alleged that the administrator was about to make distribution of the assets which had come into his hands. It was prayed that he be enjoined from doing so, and no other relief was prayed against the administrator. The existence and full performance of the above contract was alleged, and it was prayed that its execution be enforced or, if not, that appellees be adjudged to be entitled to the net value of the estate in payment of their services. The complaint of Mrs. Wycough was dismissed, but it was decreed that her husband "should recover upon the said complaint the full net value of the assets of the estate of James Swaim, deceased, the same being the agreed value of the benefits accruing to James Swaim for services rendered him," and from that decree is this appeal.

The effect of this decree is to enforce performance of the alleged contract to make a will. It is this allegation which conferred jurisdiction upon the chancery court to hear the cause, and that chancery courts have jurisdiction to enforce such contracts has been frequently recognized. See *Schwegman* v. *Richards,* 184 Ark. 968, 43 S. W. (2d) 1088, and cases there cited. And that such a contract, having been fully performed, although orally made, will be enforced, was expressly decided in the case of *Speck* v. *Dodson,* 178 Ark. 549, 11 S. W. (2d) 456. See, also, other cases to the same effect there cited.

If there was involved only the question of the value of services rendered deceased, this would be a matter within the jurisdiction of the probate court to be deter-

mined therein upon presentation to the administrator of a claim, or demand against the estate, to be paid, if allowed, in the usual course of administration, unless judgment were recovered in a suit at law upon this demand, which judgment itself would have to be filed for classification, and paid in the usual course of administration. So that the question presented for our review is whether there was a contract for the execution of a will. Before considering this question of fact it may be said that, while such contracts will be enforced in equity, in proper cases, the testimony requiring and permitting that action must be clear and convincing. See *McKie* v. *McClanahan,* 190 Ark. 41, 76 S. W. (2d) 971, and cases there cited.

We proceed to consider whether the testimony meets this requirement. The testimony is voluminous and in irreconcilable conflict, and it must suffice to summarize it. Appellees' case rests chiefly upon their own testimony and that of Felix Headstream, John P. Morrow and Richard Linebarger. Other witnesses testified in appellees' behalf, that testimony being to the effect that Swaim had lived with appellees for about six years before his death; that he was much addicted to drink, and was frequently drunk; that he was reputed to be rich and to have large sums of money, that robbers on one occasion subjected him, without effect, to torture to compel him to disclose the whereabouts of his money, and that he was thereafter afraid to live on the south side of the river near and opposite Batesville, where his farm was located, and that Swaim had stated on numerous occasions that he was living with appellees and intended to fully compensate them, but none of these witnesses stated how he intended to do so.

Headstream testified that Swaim said, in referring to his property: "I have it fixed so the ones that are taking care of me I am taking care of them." He did not say how, nor in what manner, he had done or would do so.

Morrow testified that Swaim told him he was living with appellees, and that he made their house his home and they were taking care of him; but he did not say how

he was going to take care of them. Allen Swaim gave similar testimony, and, when asked, "Did he say how they would be paid," answered, "No, he said they would be paid, would be paid good for their trouble."

Mrs. Wycough testified that she and her husband kept the county jail from January 1, 1931, to March 16, 1931, and Swaim wanted to live with them in the jail for protection, but the sheriff would not consent. They then rented a house from John Parker with the understanding that they would board Parker for the rent. Swaim came to her and said that he needed a home, and he wanted her to take care of him and Parker, and that if she would do so "he would take care of me at his death," and that she accepted his proposition, and did everything she could to make him a good home. She did his laundry, kept his room, waited upon him when he was drunk, as he frequently was, at which times he suffered from sinking spells, and she nursed him when he was sick. Swaim paid practically nothing for these services, and she relied upon his promise to take care of her at his death, and that Swaim told her that he would see that she was taken care of. She and her husband had no children, and they were required to give up their social life to a large extent to care of Swaim. He spent most of his time with them, and could have spent all of his time there had he pleased to do so. Swaim lived with her and her husband as a member of the family.

Wycough's testimony corroborated that of his wife as to their attention to Swaim, whom he had known all his life, and from whom he had frequently borrowed money until about eight years before Swaim's death. He testified that Swaim asked him to rent Parker's house, and that if he would do so and take care of him for the remainder of his life he would give him what he had at his death. The agreement was that they would board Swaim, take care of him during his illness, and do his washing, all of which they performed.

Much testimony was offered as to the state of Swaim's feeling towards his relatives. Swaim was 68 years old when he died without ever having married. It

was shown that a sister, who owned considerable property, died testate, and left him only a hundred dollars, which he refused to accept, and that he was very bitter about this discrimination against him.

Upon the death of Swaim no will was found, and it is not contended that one was ever made. The contention is that it was agreed that one should be made, under which Swaim would devise all of his property to the Wycoughs. No reason is shown why Swaim should not have made a will, had he intended to do so. There was no question about his testamentary capacity until a few days before his death. He was a competent business man and had accumulated an estate worth about thirty thousand dollars, consisting of about sixteen thousand dollars in money and notes secured by mortgages, and a small farm. Swaim was in bad health, and stated to one of his friends that he knew "he wouldn't be here for long." He received nine office treatments from his physician from February 14, 1934, to March 28, 1934, and five such treatments from October 6, 1935, to October 9, 1935, and received daily visits at his home from this doctor from October 3, 1936, to October 29, 1936, the date of his death.

After Swaim's death, Mrs. Wycough filed with the administrator a demand against his estate for $1,530, consisting of two items, one for nursing, 135 days at $6 per day, $810, the other for three years' room and board at $20 per month, $720.

Mrs. Wycough explained that she filed this demand before consulting her attorney, and in the absence of that advice thought she could not recover anything more, as Swaim had not left a will.

Opposed to this testimony was other to the following effect. While a miser and a sponger, Swaim was very careful about his personal obligations, and had the reputation of "always paying as he went." While he was resentful towards his brothers and sisters about the will of the deceased sister, he does not appear to have carried this resentment to his nephews and nieces. They lived near Swaim's farm, and he spent much time with

them and hunted and fished with them. Their testimony was to the effect that Swaim spent "a good half of his time with them." One nephew testified that for the last five or six years of his uncle's life he averaged staying with him one night a week, usually Saturday night. Other relatives testified that during the last years of Swaim's life he had spent half his time with some one of four relatives, and that the wives of one or more of these did much of the laundry work for him. Loyd Allen, a former sheriff, testified that he suggested to Swaim about sixty days before Swaim's death that he should make a will, and offered to assist him in doing so, but the offer was not accepted, but Allen testified that during Swaim's last illness personal laundry work was required, and that he went to the home of a husband of one of Swaim's nieces and got clean laundry for him, and that "they also did this three or four times before that."

Wycough himself made a crop each year, and his wife worked when she could get employment, a part of the time as a deputy of her father, who was the county tax assessor, and at other times as a clerk in a store.

During Swaim's last illness these relatives and others waited upon and sat up with him. One of these testified that a few days before Swaim's death he heard Swaim tell Mrs. Wycough that he would pay her $5 if she would stay with him that day. These relatives testified that Swaim told them they would be paid for their services at his death.

The husband of a niece testified that Swaim told him that three of his relatives would not get any part of the estate, but that the others would, and that Swaim said "I am staying with you, and eating off of you and not paying any board, but it won't be long until you are taken care of." Other relatives testified as to similar promises made them. A sister of Swaim's testified that she was sorry for her brother "because he was not put in equal with the rest of us" in her deceased's sister's will, and on this account she leased him one of the farms, which he operated, without requiring him to pay any rent.

It was shown that while in Batesville Swaim ate many of his meals, including breakfast occasionally, at first one cafe or another.

One of the nephews testified that on the very day of Swaim's funeral Mr. Wycough cautioned him against being awarded a certain tract of land on the division of the estate, for the reason that the title thereto was defective.

Swaim spent a great deal of his time about the courthouse. He had much leisure and passed considerable time there. Sherrill, a former sheriff, testified that he had during recent years frequently taken Swaim to a farm "where we were joint tenants," and on his last trip there he asked Swaim if he had a contract with the Wycoughs, and Swaim answered that he did not, and said he was living with John Parker.

More significant, and of greater weight, is the testimony of John Parker, another eccentric old bachelor, who appears to have been Swaim's boon companion. They had lived and "batched" together, as Parker expressed it. After renting his house to the Wycoughs for his own board, he and Swaim, who had previously occupied separate rooms, were put in the same room, which Swaim occupied until his death. He testified that Swaim was not connected in any way with the deal he made with the Wycoughs. This contradicts the testimony of Wycough that he rented Parker's house at the suggestion of Swaim. Within a year or two of Swaim's death, Parker had heard the Wycoughs talking about buying a farm from Swaim—a very singular thing to do if they were expecting to get this farm, and the remainder of Swaim's property upon his death. Witness had no intimation there was a contract by which Swaim was to give the Wycoughs all his property upon his death; on the contrary, he had heard Swaim say he wanted some of his nephews to have his property.

Jim Shaver was a tenant on a farm owned by Swaim, a portion of which he attempted, without success, to buy. "Last fall" he renewed his proposition, but Swaim told him he could not make a sale, for the reason that he was

on a deal to sell the land to Wycough and his wife for twelve hundred dollars. He had agreed to accept six hundred dollars cash and to give time on the other six hundred. On Labor Day before Swaim's death, Swaim told witness the trade had not been made for the reason that the Wycoughs were unable to raise the six hundred dollars, and he directed witness "to go ahead and stay there."

The administrator testified that about a week after the above-mentioned claim was filed with him, Mrs. Wycough stated that all the claim was not for herself, but a part of it was for Mr. Parker, and that about two weeks after this conversation he had another with Mr. Wycough, in which Wycough stated that Swaim had a lot of money, and that he (Wycough) said he felt he was entitled to as much of it as anybody else, but that Wycough never intimated that he had a contract entitling him to the whole estate. Mrs. Wycough asked witness if a will had been found among Swaim's papers, and when he told her that no will had been found she stated that she was not expecting Swaim to leave a will.

We have given the essence of the substantial testimony. There is other testimony on behalf of both appellants and appellees showing the attention, and the lack thereof, on the part of the Wycoughs to Swaim and the value of these services and the remarks by Swaim as to his intention to compensate the Wycoughs, and also his intention to compensate his nephews and nieces for their services; but, as was said in the beginning of this opinion, we are not concerned with this testimony in this proceeding, except in so far as the testimony tends to establish a contract to make a will, and, upon a consideration of the whole thereof, we have reached the conclusion that it does not carry that conviction of certainty which the law requires to enforce an unexecuted will.

The decree of the court will, therefore, be reversed, and the cause remanded with directions to dismiss the complaint.