SHEFFIELD, EXECUTOR, ET AL., *v.* BAKER.

4-6123                                   145 S. W. 2d 347

Opinion delivered December 9, 1940.

*John C. Sheffield,* for appellants.

*W. G. Dinning,* for appellee.

HOLT, J.  Mrs. Alice F. Weatherly died testate August 10, 1938, leaving an estate valued at $12,200. She left no children, and her husband had predeceased her by approximately eight years. John C. Sheffield was appointed executor.

Dr. J. P. Baker, appellee, brought suit against appellants, John C. Sheffield, executor, and the devisees under the will of Mrs. Weatherly, deceased, to enforce specific performance of an oral contract alleged to have been entered into between appellee and Mrs. Weatherly sometime in 1931 or 1932, whereby it was agreed that in consideration for professional services to be rendered by appellee to Mrs. Weatherly during the remainder of her life, she should devise to appellee the sum of $2,000. Appellee alleged in his complaint that he had performed the services in accordance with his oral agreement with the deceased, and, as indicated, prayed for specific performance thereof and that he be paid the sum of $2,000 out of the assets of the estate.

Appellants denied every material allegation in appellee's complaint and as a further defense pleaded that a short time after the death of Mrs. Alice F. Weatherly, appellee filed with the executor his verified, itemized statement of his claim for medical services rendered to her during her lifetime, that the claim was allowed and paid, and that the estate owes Dr. Baker nothing.

Under the terms of Mrs. Weatherly's will, executed August 30, 1937, all of her property was devised to certain relatives. Appellee, Dr. Baker, was not mentioned in the will.

Upon a trial the chancellor, upon the testimony presented, found in favor of appellee, and, among other things, decreed "that the contract made and entered into by and between Alice F. Weatherly in her lifetime, and the plaintiff, J. P. Baker, be specifically performed and that the will heretofore admitted to probate in the probate court of Phillips county, Arkansas, be so modified as to provide for the payment of the sum of two thousand ($2,000) dollars to the plaintiff, after having credited said amount with advancements heretofore made in the sum of $207.50, leaving an unpaid balance of $1,792.50, which said amount is hereby adjudged to be a proper specific bequest of the testatrix and entitled to be paid in such manner as other such bequests." From this decree comes this appeal.

The sole question for review here is one of fact: Was there a contract entered into between appellee, Dr. Baker,

and the deceased, Mrs. Weatherly, whereby she agreed to make a will bequeathing to him the sum of $2,000 for professional services?

It is a well established rule by many decisions of this court that an oral contract may be entered into for a valuable consideration whereby one may be bound to devise property and such contracts may be enforced in equity. It is equally well settled, however, that before such contracts may be enforced, the testimony on which enforcement is sought must be clear, satisfactory and convincing, in fact it must be so strong as to be substantially beyond reasonable doubt.

The rule is thus announced in *Walk* v. *Barrett*, 177 Ark. 265, 6 S. W. 2d 310, where it is said: "The chancellor found the facts in favor of appellees, and decreed specific performance of the alleged contract. In this we think he was in error. The rule of law applicable in such cases is that, before a court of equity may grant specific performance of a parol contract to convey lands, the evidence of such agreement must be clear, satisfactory, and convincing. It must be so strong as to be substantially beyond reasonable doubt. *Williams* v. *Williams*, 128 Ark. 1, 193 S. W. 82."

And in *Tucker* v. *Wycough*, 194 Ark. 840, 842, 109 S. W. 2d 939, this court said: "So that the question presented for our review is whether there was a contract for the execution of a will. Before considering this question of fact it may be said that, while such contracts will be enforced in equity, in proper cases, the testimony requiring and permitting that action must be clear and convincing. See *McKie* v. *McClanahan*, 190 Ark. 41, 76 S. W. 2d 971, and cases there cited."

And again in *Williams* v. *Williams*, 128 Ark. 1, 193 S. W. 82, in an opinion by the late Chief Justice McCulloch. we find this language: "The rule in such cases is that in order for a court of equity to grant relief in requiring specific performance of a contract the evidence must be clear and satisfactory so as to be substantially beyond doubt." See, also, *Harris* v. *Doggin*, 158 Ark. 642, 251 S. W. 696, and *Walker* v. *Eller*, 178 Ark. 183, 10 S. W. 2d 14.

With the rule, as above announced, to guide us, we must now determine whether the evidence in the instant case is sufficient to support the decree of the chancellor.

Appellee, Dr. Baker, testified that sometime in 1931 or 1932 he entered into the contract in question with Mrs. Weatherly and that he treated her for diabetes thereafter until her death about seven years later. We quote from his testimony: "Q. State what that agreement was? A. Mrs. Weatherly came to me, and told me that she had been suffering from diabetes at that time about six or seven years, I think altogether sixteen or seventeen years, and that she had to go to a doctor often and that since John had died, he left her with plenty of money to carry on and if it suit me to treat her, and give her the proper attention to the time of her death, she would give me, or will me, some money, she didn't say at that time definitely how much it would be. Q. Did you at a later date have any agreement with her as to the amount? A. Yes, she told me on three different occasions that she had already made a will setting forth $2,000 for me, for this attention to her. Q. Was it the understanding between you and her, that the amount of $2,000 was to be provided in her will for your services? A. Yes, sir, it was. He further testified that he kept no books relating to his treatments of Mrs. Weatherly.

Dr. Baker further testified: "A. Yes, as I stated awhile ago, three different times she stated she made this will, and the last days of February of last year. Q. What did she tell you at that time? A. She had Mrs. Mann call me about 5:30 in the afternoon and ask me to come by there on my way to supper, or after supper, that she had something to tell me and I went by after supper, and she told me this particular time that she had made another will today, and she told me she will me $2,000 (I'm just telling you like she said), Dr. Russwurm $500 and Mr. Jarman's wife, she didn't say how much, and Mrs. Tap Horner, Lelia Horner, and said 'I'm not going to give my kinfolks anything, John didn't want them to have anything and I am not going to give them anything.' "

He further testified that at the suggestion of the executor, he had filed a claim against the estate for services

rendered during the last 23 days of Mrs. Weatherly's illness in the sum of $167, which was allowed and paid to him, and Mrs. Weatherly had loaned him $40 on one occasion to send to his son, which amount he had not repaid. At other times she had paid him small sums totaling about $17.

J. H. Powell testified that on two occasions he heard Mrs. Weatherly say that she intended to will Dr. Baker some money and that she mentioned at one time that. "Dr. Baker had been pretty nice to her for a long time, and had given her proper services, and that she intended when she died to will him $2,000. . . . Q. She didn't say that she had made a will, or was going to make a will, but said that when she died she expected Dr. Baker to have $2,000? A. That is right." This was sometime between May 28, 1938, and her death August 10, 1938.

Mrs. Nina Powell testified that she had known Mrs. Weatherly little more than two months prior to her death, and on one occasion: "Q. Just what conversation took place between you and Mrs. Weatherly at the time she referred to her will, do you recall? A. Yes, she was talking about her relatives, said she didn't want to leave them anything; she didn't have any interest in them at all, said Dr. Baker had been so nice to her, for so long, that she intended to leave him two and held up two fingers (indicating)."

Frank Ramsey testified: "Q. Did you ever have any conversation with Mrs. Weatherly with reference to her will? A. Well, she told us about her will. Q. What did she tell you about the will? A. The way she told us, it was that she was leaving Dr. Baker $2,000 and Dr. Russwurm $500." These conversations took place in February or March, 1938. Frank Ramsey further testified that just after these conversations took place, Dr. Baker came in the house and Mrs. Weatherly "shook her finger (indicating) and said she made her will, and said 'I remembered you in my will today.' Those were the very words she said, and that is all I know about her will, because she didn't mention the sum of money she left him. Q. Well, then, that incident occurred that day, or after she told you she was going to leave $2,000 to Dr. Baker and

$500 to Dr. Russwurm? A. That occurred after. Q. Did she give any reason in this conversation about why she was going to leave the money to Dr. Baker and Dr. Russwurm? A. She said they had been so good to her for so long that she was going to leave it to them instead of to the hospital."

Mrs. Alfreda Ramsey testified that she had heard Mrs. Weatherly say several times while she was living at Mrs. Weatherly's home, between February and April, 1938, that she was going to remember Dr. Baker in her will. On one occasion Mrs. Weatherly had Dr. Baker come by the house and gave him a box of cigars, and (quoting from her testimony) "I don't know whether she changed her will, or made her will, I don't know what she said, whether she meant she had just made the will or changed it, and remembered him in the will. He carried it off like a joke, and said, 'I will never live to get anything you leave me, you are going to live a long time yet.' And later when they started getting up money for the hospital she got to thinking she was going to give something to the hospital and I don't know what brought up the conversation, but she said, 'I have decided I am not going to give the hospital anything, I feel like Dr. Baker and Dr. Russwurm have done more for people, and I am going to remember Dr. Baker, and I am going to remember Dr. Russwurm; I am going to leave Dr. Baker $2,000 and Dr. Russwurm $500 when I die."

She further testified that she heard Mrs. Weatherly say that she had her will made by Mr. Sheffield. She never saw Mrs. Weatherly pay anything for Dr. Baker's services except on one occasion when appellee got $40 from Mrs. Weatherly.

Lydia Spearman, who kept books for Dr. Baker, testified that no charges for services were ever entered on the books against Mrs. Weatherly by appellee, and that Mrs. Weatherly stated in her presence on more than one occasion that at her death she would will Dr. Baker $2,000.

Jury Thornton, appellee's chauffeur, testified that about two weeks before Mrs. Weatherly's death he heard her say that "she was going to will him some money, said

he was such a fine fellow, said she was going to leave him some money, but never did tell me how much. Q. Did she state that that was the way she was going to pay him for his services? A. She didn't say anything about that being the way she would pay him for his services."

We have attempted to set out the material parts of the testimony somewhat in detail.

After an analysis of this evidence, and a review of the record, we think the proof falls far short of measuring up to that character of testimony required under the rule which we have announced, *supra,* which requires that before a contract such as alleged here, to execute a will, may be enforced, the evidence supporting it must be more than a preponderance. It must be so clear, satisfactory and convincing as to be substantially beyond doubt that such a contract was in fact entered into.

It will be observed that Mrs. Weatherly executed her will on August 30, 1937, and in it she left nothing to Dr. Baker. According to appellee's own testimony, the contract upon which he bases his claim was entered into on an indefinite date some five or six years before the will was executed and the contract agreed upon did not provide for any definite amount to be left by her as pay for his services. Appellee himself says on this point "She didn't say at that time definitely how much it would be."

It also appears from the testimony of Mrs. Ramsey that sometime in 1938, after Mrs. Weatherly had executed her will, a conversation occurred in Mrs. Ramsey's presence between Mrs. Weatherly and Dr. Baker in which Mrs. Weatherly stated to him that she had either just made a will, or had changed her will, and had remembered him in it, and that appellee seemed to treat the matter as a joke with the remark, "I will never live to get anything you leave me, you are going to live a long time yet."

It is conceded by appellee that on one occasion Mrs. Weatherly let him have $40 in cash, which he did not repay, and at different times additional small sums totaling $17.

The record reflects that shortly after the death of Mrs. Weatherly, appellee filed an itemized, verified claim for professional services against her estate, in the sum

of $167, which was promptly allowed and paid. These and other incidents reflected by the record, we think, strongly tend to negative appellee's contention that there was an enforceable contract with Mrs. Weatherly.

It is undisputed that Dr. Baker is a physician of high standing and ability and rendered faithful and efficient services to his patient, Mrs. Weatherly, and we do not question the sincerity of his claims here, it may be that the services rendered by appellee warranted a much greater sum than he actually received, but, as indicated above, we are confronted here with the sufficiency of the proof necessary to establish and enforce a contract of the nature alleged.

Having reached the conclusion that the evidence presented by the record is insufficient to establish the contract alleged, and that the chancellor erred in holding otherwise, the decree is reversed and the cause dismissed.